IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| NORMAN KATZ, | ) | |
| | ) | Civ. No. 09-00599 ACK-RLP |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY F. GEITHNER, Secretary | ) | |
| of the Treasury, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION**

In this action, Plaintiff Norman Katz claims under the Rehabilitation Act of 1973, 29 U.S.C. § 791, that his former employer, the IRS,[1] failed to accommodate his visual disability and wrongfully discriminated against him because of that disability when it fired him in June 2007. Mr. Katz has appeared pro se throughout this action.

Mr. Katz filed his complaint in this Court on December 16, 2009. The parties filed cross-motions for summary judgment in late 2010, which the Court denied on January 21, 2011.

The Court held a four-day bench trial on February 5 through 9, 2013. At the close of Mr. Katz's case-in-chief, the IRS moved for a judgment on partial findings under Federal Rule of Civil Procedure 52(c). The Court reserved ruling on the motion. At the

---

[1] Mr. Katz properly named as Defendant Timothy Geithner, then-Secretary of the Treasury, in his official capacity, as required under 42 U.S.C. § 2000e-16(c) (incorporated into the Rehabilitation Act by 29 U.S.C. § 794a(a)(1)). For clarity here, however, the Court will refer to Defendant as "the IRS," the entity that employed Mr. Katz.

close of all evidence, the IRS renewed its motion, and the Court again reserved ruling on it.

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, and venue is proper pursuant to 28 U.S.C. § 1391(a). Having heard and weighed all the evidence and testimony presented at trial,[2] having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard plaintiff's and defense counsel's arguments and considered the memoranda submitted, and pursuant to Federal Rule of Civil Procedure 52(a)(1), this Court makes the following findings of fact and conclusions of law. Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

**FINDINGS OF FACT**

**I.   Mr. Katz's Background**

   **A.   Education & Work History**

   1.   Mr. Katz studied mathematics and engineering sciences at the Illinois Institute of Technology before transferring his grades and credits to Washington University in St. Louis, from which he graduated in 1969 with a Bachelor of Science Degree, with a concentration in accounting and a minor in economics and finance. (Parties' Joint Stipulation of Fact ("Stip. Fact") ¶ 1.)

---

[2]   The parties waived all evidentiary objections and stipulated to the admission of all exhibits with two exceptions: (1) Exhibit 31 was excluded; (2) Exhibit 122, the transcript of Mr. Katz's deposition testimony was admitted only where extracts had been designated in the IRS's pre-trial filings or where they had been discussed by witnesses at trial.

He worked in various accounting- and business-related positions before passing the examination for Certified Public Accountant in 1973. (<u>Id.</u> ¶ 2.) He worked for a large Chicago CPA firm for about a year and then as a sole practitioner. (<u>Id.</u>)

2.   In 1978, Mr. Katz bought a CPA practice in Hawaii. (<u>Id.</u> ¶ 3.) He was self-employed in that practice until about 1990, when he gave the practice to his two partners and stopped working as an accountant because of accommodative eye spasms (<u>id.</u>), a serious condition described in more detail below.

3.   From 1990 to 1994, Mr. Katz worked as a venture capitalist on an aero-electric energy project. (<u>Id.</u> ¶ 4.) From 1993 to about 2006 he took and passed Series 7, 63, 24 and 27 NASD Examinations and worked full-time as an investment banker, general principal, or financial and operations principal for seven or eight firms (one firm at a time) and for himself. (<u>Id.</u>)

**B.   <u>Visual Impairment</u>**

4.   In 1987, Mr. Katz was diagnosed with accommodative eye spasms, which caused temporary blindness and headaches if he read documents, computer screens or books at close range. (<u>Id.</u> ¶ 11.) The temporary blindness was measured during one event to last 15 minutes and during another event to last 40 minutes. (<u>Id.</u>) The only remedy for the spasms was for Mr. Katz to look into the distance or close his eyes until the spasm stopped. (Ex. 12 at 2.) Because of this condition from 1987 until his employment by the IRS in 2006, Mr. Katz received tax free disability benefits in excess of $6,500 per month. (Stip. Facts ¶ 3.)

5.    Nothing other than reading documents, computer screens or books without aids would cause accommodative spasms. (Id. ¶ 11.) Mr. Katz had been advised by doctors for years to look away from close reading every fifteen minutes. If he did so, he did not suffer from spasms. Mr. Katz testified, however, that he would get engrossed in his work and forget to look away, causing the spasms. (Ex. 122 at 96:12-97:8.)

6.    In addition to his accommodative spasms, Mr. Katz was very farsighted (Ex. 12 at 1) and had a severe astigmatism.

7.    Starting in about 1990, Mr. Katz set up a system in his home office which included a magnified computer screen that he could use from approximately five feet away. (Stip. Facts ¶ 12.) His home office also contained a high resolution video camera mounted in the ceiling above his desk that transmitted a magnified image to a large television screen about six feet away. (Id.) This allowed the Mr. Katz to read documents placed on his desk without eye strain. (Id.) Mr. Katz testified at trial, however, that documents with very small print could not be read by the camera. For such documents, Mr. Katz had to remove the pages from their binding and scan them so that he could read them on his computer.

## II.  **Mr. Katz's Hiring by IRS & First Five Months of Work**

### A.  **Hiring**

8.    In July 2006, Mr. Katz was hired by the IRS as a probationary revenue agent. (Stip. Facts ¶ 5.) He was based in Austin, Texas but was supervised by the Houston, Texas office.

(Id.) He served as the sole financial products ("FP") specialist in Austin, serving non-specialists in that office. (Id. ¶ 6.)

9.   The IRS's FP group consists of specialist revenue agents who work on specific sections of the tax code. If an IRS case requires FP expertise, an FP specialist is brought onto the case as a consultant. On any given case, the FP specialist answers to the "team coordinator," who is a generalist revenue agent. The FP specialist writes an FP report, which forms an important part of the case file and will be heavily relied on by the IRS attorney if the case goes to litigation. The team coordinator is not the FP specialist's supervisor, however; FP specialists are supervised by FP managers. Mr. Katz's supervisor was FP Team Manager Earnest Griffin, whose duty station was in Houston, Texas. (Id. ¶ 7.)

10.   Mr. Katz was interviewed for the job by Mr. Griffin and by Jimmie Moren, a generalist revenue agent manager who worked in the Austin office. (Id. ¶ 13.) After the interview, Mr. Griffin recommended to the FP territorial manager, Sharon Wong, that the IRS hire Mr. Katz. Ms. Wong testified at trial that she was unenthusiastic when she read Mr. Katz's resume, but that she trusted Mr. Griffin's judgment and approved the hire. Ms. Wong was based in San Jose, California at the time, and never met Mr. Katz before or during his hiring or employment by the IRS. (See Ex. 7 at 26:19-23.)

11.   During his interview, Mr. Katz told Mr. Griffin and Mr. Moren that he had been on disability for accommodative spasms

since 1987. (Stip. Facts ¶ 13.) Because Mr. Katz had not had a significant problem with spasms for several years and was not sure he would have problems at the IRS, he did not inform Mr. Griffin or Mr. Moren of the special equipment he used to read documents, or tell them that he would need any accommodation for his vision problems. (<u>Id.</u>) He did, however, fill out an OPM Form 256, Self Identification of Handicap, informing the IRS of his possible future need for special equipment. (<u>Id.</u>; <u>see</u> Ex 11.)

### B.   Classroom Period & Informal Training

12.   New IRS employees enter a probationary period of approximately one year. Probationary employees spend most of their first few months in classroom training. Mr. Katz was clearly an enthusiastic trainee; his classmates voted him various awards, such as "most likely to sleep with the [tax] Code under their pillow" and "most likely to Question the Taxpayer to Death." (Ex. 10.) During this time, he did not have to do much close reading and therefore did not suffer any significant accommodative spasms. (Stip. Facts ¶ 14.)

13.   After Mr. Katz's classroom period ended, Mr. Griffin arranged for him to receive informal training through Terry Eldred and Frances Mayberry in the Houston office, as well as Jimmie Moren in the Austin office. The parties dispute how much of that training Mr. Katz received.

14.   For their probationary year, new employees are assigned On-the-Job Instructors ("OJI"). Mr. Katz's first OJI was Terry Eldred, a senior FP specialist based in Houston. (Stip. Facts

¶¶ 8-9.) While Mr. Eldred was Mr. Katz's OJI, Mr. Katz received a fully successful evaluation. (<u>Id.</u> ¶ 8.) Mr. Griffin testified at trial that Mr. Katz's technical knowledge was helpful and that he performed well during this period, when he was still mostly in classroom training and did not have to juggle multiple cases.

15.   Mr. Eldred retired suddenly in December 2006, and Mr. Katz was assigned a new OJI, Frances Mayberry, who like Mr. Eldred was a senior FP specialist based in Houston. (<u>Id.</u> ¶¶ 8-9.) Ms. Mayberry was Mr. Katz's OJI from January 2007 until he was fired in June 2007. (<u>Id.</u> ¶ 8.) During that period, Mr. Katz received only failing evaluations. (<u>Id.</u>)

### C.   Accommodations for Mr. Katz's Disability

16.   Once Mr. Katz left the classroom phase of his probationary year, he had to do more close reading and began to have more significant problems with his vision. In the fall of 2006, Mr. Eldred visited Mr. Katz in Austin to train him on a software program, and saw that Mr. Katz was having considerable difficulty seeing the computer screen. (<u>Id.</u> ¶ 15.) In Mr. Katz's presence, Mr. Eldred called Mr. Griffin and informed him that Mr. Katz's vision problems interfered with his ability to work. (<u>Id.</u>)

17.   Mr. Griffin called Ms. Wong, who looked into the accommodations process and gave Mr. Griffin the name of his local accommodations specialist. Mr. Griffin contacted that person, then called Mr. Katz to tell him about the IRS's reasonable

accommodation process, and gave him the appropriate forms to fill out. (Id.)

18.  On November 17, 2006, Mr. Katz submitted a Reasonable Accommodation Request to the IRS. (Id. ¶  16; Ex. 101.) The request described his problem as "[p]oor vision which cannot be fully corrected [makes] it difficult for me to see and slows my performance." (Ex. 101.) The IRS form required Mr. Katz's doctor, Thomas Henderson, to explain how Mr. Katz's condition affected his major life activities. Dr. Henderson responded "headaches after close work." (Id.)[3/]

19.  Mr. Katz's Reasonable Accommodation Request sought "a large auxiliary screen; and an evaluation of what solutions might be available to me." (Id.) Mr. Katz initially planned to ask for a scanner as well as a large screen, and filled out a Reasonable Accommodation Request asking for both. (Ex. 1.) Mr. Griffin suggested that he request only the large screen, and Mr. Katz revised the Request to reflect that. (See id.; Ex. 9 at 210:11-18.)[4/] An IRS internal website lists various types of

_____

[3/]  Dr. Henderson's affidavit dated December 7, 2012 lists many other serious problems caused by accommodative spasms. (Ex. 12.) The Court does not doubt that Mr. Katz suffered from these problems. The part of the Reasonable Accommodation Request that Dr. Henderson filled out, however, lists only "headaches" (Ex. 101.)

[4/]  Mr. Griffin in his trial testimony denied advising Mr. Katz to change his request, but the IRS offered no other explanation for the two versions of the form. On the other hand, Mr. Katz offered his prior consistent sworn testimony during his EEOC hearing (see Ex. 9 at 210:11-18), albeit an after-the-fact self-serving statement.

8

equipment available for disabled employees, including a large-screen monitor. Mr. Griffin testified at trial that the cost of such a monitor would not be a hardship for the IRS.

20.   In response to Mr. Katz's request, the IRS reasonable accommodation liaison sent Mr. Griffin a document titled "Denial of Reasonable Accommodation Request," (Ex. 103) which he forwarded to Mr. Katz. In support of the denial, a medical consultant retained by the IRS, Dr. Sylvie Cohen, wrote that the large screen was unnecessary and that Mr. Katz should resolve his problems ergonomically by looking away from the monitor every 15 minutes and positioning the screen 12 to 16 inches away from himself. (See Ex. 102.) Dr. Cohen describes herself as an "occupational medicine consultant" (see id.) and there is no indication in the record that she has any specialty in ophthalmology.

21.   Mr. Katz learned of this opinion in December 2006 or early January 2007. (Stip. Facts ¶ 18.) Mr. Katz testified at trial that Dr. Cohen's first piece of advice was the same advice he had received from his own doctors for years, but that the second piece of advice was wrong. According to Dr. Henderson's affidavit, Dr. Cohen did not contact Dr. Henderson and erred in assuming that Mr. Katz was nearsighted. (Ex. 12.) Nonetheless, Mr. Katz never told anyone at the IRS that he believed Dr. Cohen's opinion to be unreasonable or unworkable. (Stip. Facts ¶ 21.)

9

22.   Mr. Griffin testified at trial that he had no way of evaluating Dr. Cohen's opinion, and Mr. Katz testified that he did not tell Mr. Griffin (or anyone else at the IRS) that Dr. Cohen's opinion was wrong. Mr. Griffin knew, however, that Mr. Katz had a home office set up with equipment that was designed to work with his visual disability. Under IRS policy, probationary employees are not allowed to work from home. Mr. Griffin nonetheless secured Ms. Wong's permission and allowed Mr. Katz to work from home.

23.   Unfortunately, Mr. Katz was unable to connect his IRS laptop to his home computer monitor. When he contacted an IRS computer technician, the computer technician told him that IRS policy did not allow employees to connect IRS computers to home equipment. (See Ex. 18 at 10.8.1.5.2.5(3)-(4).) Mr. Katz told Mr. Griffin what the computer specialist had said. In his trial testimony, Mr. Griffin recalled Mr. Katz's worry that he had gotten Mr. Griffin into trouble. Mr. Griffin told Mr. Katz that he was allowed to connect the IRS laptop to a home monitor, and that the rules only prohibited connecting home devices that could transmit data - such as a CPU - to the IRS systems. Mr. Griffin testified that he was not aware that Mr. Katz was never able to connect the IRS laptop to his home monitor; their conversation was about the IRS's policies, not about Mr. Katz's equipment problems. Mr. Griffin also testified that he has been able to connect his own personal monitor to an IRS computer.

24.   It is undisputed that Mr. Griffin never saw Mr. Katz's home office; it does not appear that Mr. Katz ever invited Mr. Griffin to see his home office, and both Mr. Griffin and Ms. Mayberry testified at trial that they believed it was office policy that managers should not visit employees who were working from home.

25.   Since Mr. Katz could not connect his IRS laptop to his home monitor, he continued to use the laptop screen at home when he needed to work within the IRS system. When Mr. Katz remembered to look away from the screen every 15 minutes or so, he generally succeeded in avoiding accommodative spasms. (Stip. Facts ¶ 19.) He sometimes forgot to look away, however, because he became engrossed in his work. (Id.) The combination of having to take breaks every 15 minutes or so and of recovering from spasms when he forgot to look away required him to put in more than eight hours a day to complete eight hours of productive time during the day. (Id.)

26.   The "Denial of Reasonable Accommodation Request" lays out specific steps for an employee to follow if he wants the IRS to reconsider its decision or appeal. (Ex. 103.) Mr. Katz did not follow any of these steps.

27.   On February 16, 2007, Mr. Katz sent an e-mail to co-workers explaining the accommodations and his surgeries. (Ex. 105.) He noted that having to take frequent breaks required him to work longer hours. (Id.)

11

28.   At some point, Mr. Griffin noticed that Mr. Katz had billed time worked on a Sunday. Mr. Griffin contacted Mr. Katz and told him that he could not bill more than eight hours of work per day without pre-clearing the time with a supervisor. It is undisputed that Mr. Katz sent Mr. Griffin e-mails outside of normal work hours. Mr. Griffin's testimony that he did not infer from these e-mails that Mr. Katz was working long hours was not credible.[5/] It was, however, entirely consistent with Mr. Griffin's further testimony that new FP specialists work long hours because they are trying to learn, and that even experienced FP specialists often work twelve- to fourteen-hour days. Mr. Griffin's testimony that he did not infer that Mr. Katz was working long hours <u>because of his disability</u> is therefore credible. Mr. Katz testified at trial that he never asked to have his workload reduced for any reason, let alone because of his visual problems.

### D.   Early Political & Religious Incidents

29.   Early in his classroom training period, Mr. Katz had a conversation with Mr. Griffin about Judaism. Mr. Griffin teaches a Sunday school class, and asked Mr. Katz to send him examples of the Jewish calendar, so that he could teach his class about the Jewish roots of Christianity.

30.   On September 11, 2006, FP specialist Gerald DeLuca made statements that led Mr. Katz to believe that he was being

---

[5/]   In general, however, the Court found Mr. Griffin to be a very credible witness.

targeted for his political beliefs - in particular, for declining to condemn President Bush in connection with the Iraq war. (Stip. Facts ¶ 24.) Mr. Katz testified during his deposition that he felt the conversation with Mr. DeLuca was a "vetting" interview on the part of Mr. DeLuca, Mr. Griffin, and Ms. Mayberry, to discover his political allegiances. (Ex. 122 at 91:25-93:11.) At trial, Mr. Katz testified that over the succeeding months after the conversation with Mr. DeLuca, Mr. Katz felt that Mr. Griffin's attitude towards him changed and became less friendly and more distant.

31.   In early January 2007, Ms. Mayberry visited Mr. Katz in Austin. He picked her up from the airport wearing a baseball cap. He testified at trial that when he removed his baseball cap and Ms. Mayberry saw his yarmulke, she looked shocked and ill-at-ease.

**III.  Post-Classroom Work History**

> **A.   Work Study Assignment**

32.   Mr. Katz completed his "Phase II" classroom training in December 2006. The training involved a written test. Mr. Katz received a high score on the test, but missed some questions. Ms. Mayberry therefore created a "work study" program, dividing the missed questions into four sets, with four deadlines spaced over the coming months to turn in a short summary of the correct answers. (See Ex. 126.) Ms. Mayberry testified at trial that she sent Mr. Katz reminder e-mails before each deadline. She testified that she expected Mr. Katz to spend about 15 or

13

20 minutes per question, for a total of one and a half to three hours. She likewise required the other two FP trainees to explain the questions they had missed; and they responded promptly within her deadlines.

33.  On March 21, 2007, Ms. Mayberry and Mr. Griffin exchanged e-mails regarding Mr. Katz's progress in meeting training deadlines. (Ex. 128.) Mr. Katz had at that point missed all four deadlines. (Id.) Ms. Mayberry then set him a final deadline of May 30, 2007, to turn in the work study. (See Ex. 131.) Mr. Katz met that deadline. (See id.)

34.  Mr. Katz testified at deposition that he felt that the work study assignment was "a punishment" given because Ms. Mayberry didn't like him. (Ex. 122 at 122:4-11.) He described the assignment as "inane" and "the ego mania of a crazy woman." (Id. at 102:23; 140:13-15.) He admitted that he "sloughed it off" in favor of other work that he believed was more important. (Id. at 102:20-103:8.) He testified at deposition that, while he "never missed a real [deadline]," "[t]hey may have sent me e-mails that I didn't respond to saying that they want it done by a certain time." (Id. at 120:15-20.) He also testified in his deposition that he did not have time to do the assignment because he was working such long hours on his cases. (See id. at 122:22-123:13.) He never, however, told Ms. Mayberry that his visual disability was interfering with his work.

35.  Mr. Griffin did not infer from Mr. Katz's missed deadlines that the accommodation for his visual disability was

14

not working. Mr. Griffin testified that there can be any number of different reasons for an employee to fail to meet deadlines. He testified that being able to juggle an inventory of several cases with multiple issues is challenging and that he expected all new FP employees to encounter some problems with time management.

**B.**   **Bridge Case**

36.   Mr. Griffin testified at trial that he assigned Mr. Katz cases that would use Mr. Katz's experience in the securities industry. He repeatedly noted Mr. Katz's passion for the technical aspects of FP work, and for complex securities cases in particular. Mr. Griffin testified that he assigned Mr. Katz fewer cases than the other two new employees training in FP at that time because Mr. Katz was new to the IRS; while the other two trainees had transferred to FP from other IRS divisions. Mr. Katz was given five or six open cases at any one time; while the other trainees were given eight to ten.

37.   Mr. Katz's largest case was the "Bridge Case."[6/] The Bridge Case was originally assigned to Mr. DeLuca (see Ex. 21), but was reassigned to Mr. Katz in late 2006 (see Ex. 2 at 126:2-6). The case had a short deadline, which was originally set for December 2006, but was later extended to July 2007.[7/] The case

_____

[6/]   All IRS cases were referred to at trial using fictitious names, to protect taxpayers' confidential information.

[7/]   Mr. Griffin and Ms. Mayberry explained at trial that the IRS normally has a fixed statutory deadline to audit a tax return. The taxpayer may - and in this case did - agree to extend

involved a complex transaction, known as a binary option, arranged by a securities broker between an American company and a related Irish company, which the IRS believed to be a tax shelter. (Its finer details, although discussed extensively at trial, are not relevant to Mr. Katz's claims.)

38.  Mr. Katz had discussed his theory of the Bridge Case with Mr. Eldred as early as November 2006. (Ex. 129.) Mr. Katz believed that the transaction in the Bridge Case was effectively a "proposition bet," a kind of Las Vegas bet on a contest set up between one party and a counter party or parties where a third party holds the money and acts as judge. (Stip. Facts ¶ 25.) He analogized the transaction to a rigged roulette table. (Ex. 129.) Mr. Eldred disagreed, stating that the transaction was not a wager. (Id.)

39.  Mr. Katz discussed his theory of the case with Ms. Mayberry after she became his OJI in January 2007. Mr. Katz wanted to use IRC Section 165(d) disallowing losses from wagers except to the extent of winnings in the current year, in addition to making a sham transaction argument under IRC Section 165(a). (Stip. Facts ¶ 25.) Ms. Mayberry disagreed. She testified at length at trial that she felt that Mr. Katz's use of betting and gambling terminology undermined the IRS's position in the case by implying that the taxpayer was taking on risk in the transaction, when in fact the transaction was a tax shelter with a fixed

---

the statutory deadline.

result and no risk. She believed that Mr. Katz should apply IRC Section 1092 to the case.

40. Mr. Katz came to believe that Ms. Mayberry was too rigid and did not have the mathematical skills and legal knowledge to understand why IRC Section 165(d) should apply to the case. (Id.) Ms. Mayberry at some point told Mr. Griffin about the dispute. Mr. Griffin testified at trial that at that time he considered it a healthy discussion and saw no need to interfere.

41. Carlton Anderson was the team coordinator on the Bridge Case. (Id. ¶ 6; see Ex. 2 at 119:22-120:1.) Mr. Anderson testified during the EEOC hearing on Mr. Katz's claim that he had agreed with Mr. Katz on the bet option issue and felt that Mr. Katz's work on the Bridge Case was good. (Ex. 2 at 120:7-20; 121:16-24.) Mr. Anderson was not an FP specialist, however. Mr. Moren was the team manager on the case and disagreed with Mr. Katz's analysis.

42. On February 21, 2007, Mr. Moren called Mr. Griffin and requested a conference call regarding the Bridge Case. (See Ex. 106.)[8/] Mr. Griffin called Mr. Katz and scheduled a conference call for 9:00 a.m. (Id.) Mr. Katz was reluctant to

---

[8/]  In their Joint Stipulation of Fact, the parties stated that Ms. Mayberry initiated this phone conference. (Stip. Facts ¶ 25.) Ms. Mayberry and Mr. Griffin testified at trial, however, that Mr. Moren initiated the phone call. Their testimony is corroborated by Mr. Griffin's contemporaneous memorandum regarding the call. (Ex. 106.) The Court finds that Mr. Moren initiated the phone call.

join the call because of a scheduling conflict with work on another case. Mr. Griffin ordered Mr. Katz to be on the call.

43.   During the conference call, in front of Mr. Moren and Mr. Anderson, Ms. Mayberry and Mr. Griffin told Mr. Katz not to claim that the taxpayer was using a gambling strategy under 165(d). (Stip. Facts ¶ 26.) Mr. Moren at one point said "We will be laughed at." (Id.) Mr. Katz replied "You are the boss. If you want me to fly with one wing, I'll fly with one wing." (Id.) Mr. Katz believed at the time that Ms. Mayberry had set up the conference call in order to undermine him.[9]

44.   Later that same day, Mr. Griffin e-mailed Mr. Katz a written summary of his job performance on the Bridge Case. (Id. ¶ 27; see Ex. 106.) Mr. Griffin told Mr. Katz in that summary that his "attitude and approach to the needs of the customer[10] in this case [was] unacceptable." (Ex. 106.) Mr. Griffin informed Mr. Katz that he was failing several critical elements of his job, including juggling priorities and case matters. (Id.) Ms. Wong, the FP territorial manager, testified at trial that she saw this document shortly after Mr. Griffin wrote it.

45.   Two days later, Mr. Katz replied to the e-mail, copying Mr. Moren and defending his performance on the Bridge Case. (Ex. 125 at 2-3.) In the e-mail, he stated that he was "willing

---

[9]   Mr. Katz testified at trial that he no longer believes this.

[10]   FP specialists often refer to the team manager as the "customer."

to defer on the issue to your practical experience and wisdom." (Id. at 2.) Mr. Griffin responded that he, not Mr. Moren, was Mr. Katz's supervisor, and that if Mr. Katz had issues with his performance review, he should not involve Mr. Moren. (Id.) Mr. Katz replied asking Mr. Griffin to reconsider his performance review. (Id. at 1-2.) He stated that at the time of the February 21 conference call he believed that the use of the gambling terminology was still up for discussion. (Id. at 2.) He also noted, however, that on February 23 he had told Mr. Moren over lunch that he "had given the matter some thought and realized that the wagering approach was novel and there might be practical reasons for not raising it." (Id.) Mr. Katz described Mr. Moren as "satisfied with my willingness to bow to more experienced judgment." (Id.) Mr. Griffin declined to reconsider his February 21 review, but stated that he would attach Katz's response to the write-up and that he would continue to monitor Mr. Katz's performance during his probationary period. (Id. at 1.)

46.  At some point after the February 21 conference call, Mr. Katz and Mr. Griffin again discussed using "bet" terminology in the Bridge Case FP report. Mr. Katz pointed to a page from The Handbook of Exotic Options (Israel Nelken, ed.) in which "bet option" is given as a synonym for "binary option." (See Ex. 19.) Mr. Griffin told Mr. Katz that he could footnote this point. There was apparently a miscommunication; Mr. Katz testified at trial that he believed that Mr. Griffin had told him he could use the term "bet" as long as he footnoted it. Similarly, at some

point Mr. Katz showed Mr. Griffin a schedule he had prepared for the Bridge Case (Ex. 24) and Mr. Griffin told him it was good work. The schedule uses the word "bet." (See id.) Mr. Katz again took this as a sanctioning of his use of the word. Mr. Griffin testified at trial, however, that he in no way meant to sanction the use of that word, except in a footnote. Regardless, Ms. Mayberry testified that Mr. Katz never told her that Mr. Griffin had approved the use of the term.

47.   On March 5, 2007, Ms. Mayberry sent Mr. Katz an e-mail regarding his use in the draft FP report of Mr. Anderson's work product. (Ex. 107.) Ms. Mayberry testified at trial that this was another significant problem with Mr. Katz's work on that report. Both she and Mr. Griffin testified that FP specialists were advised not to use the work of agents who were not FP specialists, because non-specialists' analysis was likely to be incorrect. Ms. Mayberry also testified that she wanted Mr. Katz to draft his own report because he was a trainee and needed to learn how to do it.

48.   On March 14, 2009, Ms. Mayberry sent Mr. Katz an e-mail regarding his use of Mr. Anderson's draft report and the bet option issue. (Ex. 109.)

49.   On March 19, 2007, Mr. Griffin met with Mr. Katz to go over Mr. Griffin's write-up of the February 21 conference call. (See Ex. 110.) He memorialized their discussion in a memorandum. (Id.) Mr. Griffin told Mr. Katz that he had to consider the team manager's comfort level with terms he used in the FP report.

(Id.) He stated that an FP specialist must be able to juggle priorities. (Id.) He told Mr. Katz that he had not properly documented all contacts he had on his cases, and showed him how to start doing so. (Id.) Mr. Griffin also told Mr. Katz that he could not make disparaging remarks about coworkers in his e-mails. (Id.) Mr. Katz asked whether he could have a chance to improve his performance; Mr. Griffin responded that there was time to improve his performance and that Mr. Griffin would continue to monitor it. (Id.) Mr. Griffin suggested that Mr. Katz take online time management and risk management courses offered by the IRS. (Id.) Mr. Katz never took those courses.

50.  On March 19, 2007, Ms. Mayberry and Mr. Katz talked over the phone regarding aspects of his performance. (Stip. Facts ¶ 31.) The parties stipulated that "Ms. Mayberry said something along the lines of asking if she had to throw a rock at Mr. Katz's head to get his attention." (Id.) The two continued the discussion by e-mail that same date. (Id.; see Ex. 111.) In the e-mail exchange, Mr. Katz noted that he did not feel he had sufficient training on how to write FP reports. (Ex. 111.)

51.  On March 23, 2007, Ms. Mayberry and Mr. Katz exchanged e-mails concerning Mr. Katz's draft report. (Ex. 113.) Ms. Mayberry stated "To say I am annoyed with you is an understatement . . . . You have ignored all of my recommendations." (Id. at 2.) Mr. Katz responded "I have not ignored you and I have reviewed the code sections and regulation to which you have referred me . . . . So far I do not see the

21

argument you want me to make." (Id. at 1.) He repeatedly noted that the report had been drafted by Mr. Anderson. (Id.) Ms. Mayberry reported to Mr. Griffin that their dispute was continuing; Mr. Griffin reported that fact to Ms. Wong.

52.   On March 27 or 28, 2007, Ms. Mayberry and Mr. Katz had a telephone call regarding Mr. Katz's latest draft of the Bridge Case FP report. Ms. Mayberry testified at trial that Mr. Katz became very angry and was screaming at her, saying that he knew more tax law than she did and that he ought to be her OJI.[11] Mr. DeLuca, who was in the same room as Mr. Katz while he was on the call, described Mr. Katz in an affidavit as "shaking violently and spitting into the phone because he was in such a rage." (Ex. 6A at 4.) Ms. Mayberry described this call at trial as her worst interaction with Mr. Katz. She repeatedly testified at trial that Mr. Katz was very nice to her as long as they were not discussing the Bridge Case, and compared the abrupt changes in his manner to the story of Dr. Jekyll and Mr. Hyde.

53.   During his deposition Mr. Katz repeatedly described Ms. Mayberry as "stupid." (Ex. 122 at 107:10-108:3; 155:8-12.) He also described her as "obstinate," "rigid," and "somewhat senile" and stated that "there was something wrong with her" and that

_____

[11]   Ms. Mayberry's memory is corroborated by Mr. Katz's deposition testimony, in which he described her as "a woman [who] worked for the IRS for 30 years or something like that, and she didn't even understand the very basics of stuff that I was taught in . . . the very first course I took." (Ex. 122 at 155:1-4.) When asked whether he felt he had things to teach Ms. Mayberry, he answered "Oh, absolutely. I mean, I was an expert in my field." (Id. at 168:15-21.)

"[s]he was not functioning right." (Id. at 155:14-19; 156:19-20; 167:15-22.) He also testified that he believed she was an anti-Semite. (Id. at 106:6-18.) During trial, Mr. Katz testified that he now regretted some of his word choices, but that they were likely an accurate representation of his feelings in 2007.

54. Ms. Mayberry reported the March 27 phone call to Mr. Griffin, who held a conference call with both Ms. Mayberry and Mr. Katz to discuss the issue.

55. On April 27, 2007, Mr. Katz attended a meeting with an executive officer of the taxpayer company on the Bridge Case. Ms. Mayberry testified at trial that he did well at the meeting and asked professional and helpful questions.

56. The final version of the FP report that Mr. Katz submitted still contained frequent references to bets and a lengthy analogy to a roulette wheel. (See Ex. 27 at 25-27.) This version of the FP report contains a discussion of section 1092, the section which Ms. Mayberry wanted to apply, but the discussion consists largely of block quotations from the code section. Mr. Katz testified at trial that the discussion of section 1092 was not good work because his heart was not in it. Ms. Mayberry testified at trial that Mr. Katz's presentation and analysis of the facts was excellent, but that his law and argument section was seriously flawed. She also noted that the final version of the report continued to use Mr. Anderson's layout.

57.   Ms. Mayberry and Mr. Griffin testified at trial that the Bridge Case closed in July 2007 without an FP report, because Ms. Mayberry was unable to rewrite the report to an appropriate standard before the deadline.

### C.   Work on Other Cases & Evaluations from Other Co-Workers

58.   On March 13, 2007, Mr. Livingston, who was acting FP team manager while Mr. Griffin was on detail, sent Mr. Katz a performance review. (Stip. Facts ¶ 29; Ex 108.) Mr. Katz responded by e-mail on March 15, 2007. (Ex. 108.) Mr. Livingston's evaluation was negative because Mr. Katz had failed to timely complete a spreadsheet on a case known as "SILOs." (Id.) Mr. Griffin testified at trial that it was later determined that Mr. Katz had been given improper instructions on the spreadsheet, which was far more complicated than anyone had realized, and that Mr. Griffin therefore did not consider Mr. Livingston's negative review when he decided to recommend firing Mr. Katz. Nonetheless, Mr. Livingston's review was one of the documents considered by Ms. Wong and listed in Mr. Katz's termination memorandum. (Ex. 119.)

59.   Three of Mr. Katz's former co-workers, Robert Northcutt, Robert Davis, and Michael FitzGerald, testified during Mr. Katz's EEOC proceeding that they had never observed Mr. Katz being hostile, argumentative, loud, or angry. (See Ex. 3 at 101:18-24; Ex. 4 at 110:23-25; Ex. 5 at 136:25-137:4.) Mr. Davis, an IRS supervisor on whose case Mr. Katz consulted, also testified at the EEOC proceeding that Mr. Katz's work on his case

and his discussion of another technical matter was helpful and on point. (Ex. 4 at 112:15-18; 114:7-15.) Mr. FitzGerald, an IRS agent in Austin who worked on three different cases with Mr. Katz, testified at the EEOC proceeding that Mr. Katz's workpapers on his cases were good. (Ex. 5 at 142:24-144:12.) The Court notes that these witnesses were not FP specialists and were not involved in reviewing or criticizing Mr. Katz's work.

### D.   Spring 2007 Medical Procedures

60.   At some time in late 2006 or early 2007, Mr. Katz went to see Dr. Mitchel Wong in Austin about his vision problems. (Stip. Facts ¶ 21; see Ex. 13.) Dr. Wong informed Mr. Katz that his accommodative spasms could be cured by cataract surgery and that his corrected vision because of cataracts was less than 20/50. (Stip. Facts ¶ 21.)

61.   Mr. Katz underwent cataract surgery on one eye on February 7, 2007, and in the other eye on March 7, 2007. (Ex. 13.) He took three days off of work for each surgery. (Stip. Facts ¶ 21.) His last episode of accommodative spasm was March 8, 2007. (Id. ¶ 23.)

62.   Nonetheless, Mr. Katz's corrected vision was not very good because the implants were not able to correct for Mr. Katz's undersized eyes and he remained farsighted making it difficult for him to work at close range until he was able to obtain corrective glasses, a process requiring time for his vision to stabilize to get a prescription for the glasses. (Id.) He also still had a severe astigmatism. Mr. Katz testified at trial that

25

he had to get new lenses for his glasses up to once every two weeks during this period. Nonetheless, he was able to sharply reduce the amount of extra time he had to put in to complete his work. (Id.) On March 20, 2007 in an e-mail to Mr. DeLuca, Mr. Katz described his frequently-changing prescription as "not as bad as it sounds. But, it is a nuisance." (Ex. 127.)

63.  Mr. Katz underwent "Yag" laser surgery on April 12 and 19, 2007. (Ex. 13.)[12/] Finally, he underwent Lasik surgery on both eyes on June 14, 2007 (id.), which improved his astigmatism problem.

## IV.  Formal Evaluations and Termination

64.  At some point during the spring, Ms. Wong, who had seen Mr. Griffin's February 21 write-up and Mr. Livingston's March 13 review of Mr. Katz, asked Mr. Griffin to create an improvement plan for Mr. Katz, which would set a baseline and a 60-day window for improvement. Ms. Mayberry drafted an improvement plan (Ex. 114), which Ms. Wong and Mr. Griffin reviewed.

65.  On April 5, 2007, Ms. Mayberry personally delivered the improvement plan to Mr. Katz, and the two discussed it in person. (Stip. Facts ¶ 34; see Ex. 115.) The plan noted that Mr. Katz had "exhibited a hostile and argumentative attitude towards any and all recommendations and suggestions" and told him that he must work on adopting a calmer attitude and "refrain from loud, angry

---

[12/]  Mr. Katz noted in his closing argument that "Yag" surgery treats clouding of the lens that sometimes occurs after cataract surgery. A laser is used to cut a hole in the clouded lens to allow light to pass through.

outburst." (Ex. 114.) Mr. Katz testified at trial that he rejected the terms "hostile," "loud," and "aggressive" but that he could see someone describing him as "arrogant"; he admitted that he shows his irritation. He testified that he understood at the time that if he did not follow the improvement plan he might be fired.

66.  Ms. Mayberry testified at trial that Mr. Katz was visibly upset at the April 5 meeting, but was not abusive. She told Mr. Katz that his knowledge of securities products was helpful to the FP program and that almost all of his performance problems could be corrected if he developed a better attitude. She felt they made progress at the meeting. Mr. Katz testified at trial that when he drove Ms. Mayberry to the airport after this visit, she stated that the United States was fighting the war in Iraq because of Israel. (Ex. 34 at 3.)[13/] Ms. Mayberry denies making this statement.

67.  On April 9, 2007, Ms. Mayberry summarized her work with Mr. Katz in a memo to Mr. Griffin. (Stip. Facts ¶ 35; Ex. 115.) She noted that they still disagreed over the appropriate terminology to use in the Bridge Case, but that Mr. Katz had agreed to work with her. (Ex. 115.) Ms. Mayberry noted in this evaluation that Mr. Katz had told her he was working 60 hours a week. (Id.) She testified at trial that Mr. Katz had told her

---

[13/]  Exhibit 34 consists of a statement in question-and-answer form which Mr. Katz read into the record as his testimony on direct.

before that he worked extra hours, but had never put such a large number on it before. She testified that he did not say exactly what he was working on, but that her impression was that he was doing outside research on technical issues. She testified that Mr. Katz did not mention his vision problems and did not mention any problems connecting his home monitor. Ms. Mayberry told Mr. Griffin in her write-up that she hoped to revise her evaluation in the future as Mr. Katz made progress. (Id.) She stated that Mr. Katz was still adjusting to IRS culture and learning his job. (Id.) She stated that the FP program would "reap big benefits" from Mr. Katz's technical expertise in securities. (Id.)

68.   On April 11, 2007, Mr. Katz sent a fax to Mr. Griffin, in which he described the statements in the April 5 improvement plan as "untrue, abusive, outrageous, unfair, humiliating, a tirade, lacking in examples, character assassination, and not otherwise helpful." (Ex. 30.)

69.   Mr. Griffin testified at trial that after the April improvement plan had been delivered, he consciously took a step back, to see whether Ms. Mayberry would be able to work with Mr. Katz to follow the improvement plan. Ms. Mayberry testified at trial that she had believed after the April 5 meeting that their dispute over the "bet" terminology in the Bridge Case FP report was settled, but that nothing changed in Mr. Katz's subsequent drafts of the report. She did testify, however, that his manner improved and that he was less hostile towards her.

70.   In early June 2007, at the end of the 60-day improvement period, Mr. Griffin conducted a workload review of Mr. Katz's cases other than the Bridge Case and the SILO case. He found that Mr. Katz's workpapers were largely inadequate or missing. Mr. Griffin testified at trial that he felt that while Mr. Katz was passionate about the technical side of FP work, he was not interested in the administrative aspects of the job and considered them bureaucratic. Mr. Griffin drafted a written review of Mr. Katz's workpapers (Ex. 116), which he showed to Ms. Wong. Ms. Wong testified at trial that after she saw the review she told Mr. Griffin to contact an IRS labor relations specialist to discuss firing Mr. Katz. Mr. Griffin delivered his written workload review to Mr. Katz on June 8, 2007.[14/]

71.   On June 11, 2007, Ms. Mayberry wrote an evaluation of Mr. Katz's work, focused mainly on the Bridge Case. (Stip. Facts ¶ 37; Ex. 118.) She noted that Mr. Katz had missed his original work study deadlines; had stubbornly continued to use the "bet" terminology and argument in the Bridge Case report; and had turned in inadequate workpapers. (Ex. 118.) She also noted, however, that Mr. Katz's attitude had improved somewhat since their April 5, 2007 meeting, and listed recommendations for his future work. (Id. at 2-3.) Ms. Mayberry testified at trial that she knew at this point that Mr. Katz might get fired, but that

_____

[14/]   The parties' joint stipulated facts state that Ms. Mayberry conducted this review (Stip. Facts ¶ 36), but all testimony at trial indicated that Mr. Griffin conducted it. The Court finds that Mr. Griffin conducted the review.

she also believed there was a possibility that he would continue
at the IRS.

72.  Mr. Katz drafted a written response to Mr. Griffin's
June 8 review, received by Mr. Griffin on June 19, 2007.
(Ex. 117.) Evidently, sometime before June 19, Mr. Griffin had
told Mr. Katz that he was going to be fired. (Id. at 1.) In
Mr. Katz's response, he attributed all of his problems in 2007 to
Ms. Mayberry's supervision. (Id.) He stated that Ms. Mayberry
bore "some deep seated hatred for me that I cannot fathom or
understand" and that she had "manipulated and schemed to get me
fired." (Id. at 4.) He dated this bias from when Ms. Mayberry saw
his yarmulke. (Id. at 5.) He stated that his work on the Bridge
Case had been "very professional and exemplary" and argued that
the fact that it had not been included in the review was evidence
of bias. (Id. at 6.) Mr. Katz noted that his visual impairment
and eye surgeries had caused him to work extra hours and
described the accommodation he was given as "limited." (Id. at
4.) He stated that Ms. Mayberry "failed to make even minimal
allowances" for his disability. (Id. at 6.) He complained that he
did not receive sufficient training in workpapers. (Id. at 5.) He
also complained that he felt the work environment was oppressive
and that it was not acceptable for him to disagree and express
his views. (Id.)

73.  Mr. Griffin testified at trial that Mr. Katz's response
did not change his view that Mr. Katz should be fired. He
testified that if the Bridge Case had been included in

Mr. Griffin's June 8 review, the review would only have been more negative. Mr. Griffin did not ask for input from IRS employees other than Ms. Mayberry regarding Mr. Katz's performance; he testified at trial that he thought that would be inappropriate. Mr. FitzGerald testified at the EEOC proceeding, however, that, as a team coordinator on a case Mr. Katz worked on, he should have been asked for input on the evaluation of Mr. Katz. (Ex. 5 at 140:8-10.)

74.  On June 21, 2007, Ms. Wong issued Mr. Katz a termination memorandum. (Stip. Facts ¶ 38; Ex. 119.) The memorandum stated that he was being fired based on his four failing evaluations dated February 21, March 5, April 5, and June 8, 2007 (see Ex. 119), and Ms. Wong testified at trial that those were the documents she reviewed before issuing the memorandum. In the memorandum, she stated that at each of the four evaluations he failed at least three "Critical Elements" of his work, and that at the April 5 review he failed all of them. (Id.)

75.  On July 10, 2007, Mr. Katz signed and sent to the Office of Special Counsel a complaint form alleging violation of the Hatch Act and that his termination was, at least in part, motivated by the political beliefs of Mr. DeLuca, Ms. Mayberry, and Ms. Griffin. (Stip. Facts ¶ 39; Ex. 120.) He stated that "[t]he argument that I was fired because of poor performance is completely fabricated out of thin air." (Ex. 120 at ¶ 15.)

31

## CONCLUSIONS OF LAW

Having evaluated the factual aspects of the evidence, the Court will now make its conclusions of law.

1.   Mr. Katz was a federal employee, and his claims therefore arise under section 501 of the Rehabilitation Act, 29 U.S.C. § 1971. <u>Boyd v. U.S. Postal Serv.</u>, 752 F.3d 410, 413 (9th Cir. 1985). The IRS is covered by the Rehabilitation Act, which applies to "[e]ach department, agency, and instrumentality . . . in the executive branch." 29 U.S.C. § 791(b).

2.   Section 501 of the Rehabilitation Act provides for two types of claims: (1) claims based upon the government's failure to reasonably accommodate an employee's disability, as required under 29 U.S.C. § 791(b); and (2) non-affirmative action employment discrimination claims based on 29 U.S.C. § 791(g). Mr. Katz brings both types of claim.

3.   In 1992, Congress amended the Rehabilitation Act to clarify that its standards for evaluating employer conduct are those applied under the Americans with Disabilities Act ("ADA"), as such sections relate to employment. 29 U.S.C. § 791(g).

**I.   Failure To Accommodate**

4.   Regulations promulgated under the Rehabilitation Act require governmental employers to make reasonable accommodation to the known physical or mental limitations of a disabled employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its program. 29 C.F.R. § 1613.704(a). This regulation contains

32

three elements: (1) plaintiff must be a qualified disabled
individual; (2) the employer must make reasonable accommodation
to the disability; and (3) the accommodation need not be made if
it would impose an undue hardship. Fuller v. Frank, 916 F.2d 558,
561 (9th Cir. 1990).

### A.   Qualified Disabled Individual

5.   An individual with a disability is someone who has "a
physical or mental impairment which substantially limits one or
more of the person's major life activities." 29 U.S.C.
§ 705(20)(B). For purposes of section 501, the term "physical or
mental impairment" means "any physiological disorder or condition
. . . affecting [inter alia] special sense organs . . . ." 29
C.F.R. § 1614.203(b); Id. § 1630.2(h). The term "substantially
limits" "clearly precludes impairments that interfere in only a
minor way . . . from qualifying as disabilities." Toyota Motor
Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). To be
substantially limited, the plaintiff must be "significantly
restricted as to the condition, manner or duration under which
[he] can perform a particular major life activity as compared to
. . . the average person in the general population." Id. at

195.[15/] The regulations list "seeing" among "major life activities." 29 C.F.R. § 1630.2(i)(1)(I); see id. § 1614.203(b).

6.   Mr. Katz presented sufficient evidence at trial to prove that his accommodative spasms amounted to a disability under the meaning of the Rehabilitation Act up until March 8, 2007, the date of his last accommodative spasm. During this period, Mr. Katz suffered from episodes of blindness that could last for up to forty minutes. While having a spasm he was unable to work, read, or drive a car. Because of the spasms he had been forced to give up his CPA practice and had to set up a sophisticated home office that would enable him to work from home despite his vision problems. At trial, the IRS affirmed that it would not contest that Mr. Katz was disabled up until March 8, 2007.

7.   To fall within the protections of the Rehabilitation Act, Mr. Katz must also demonstrate that he was "qualified," that is, that he "satisfie[d] the requisite skill, experience, education, and other job-related requirements" of his position "and, with or without reasonable accommodation, [could] perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

---

[15/]   The ADA Amendments Act of 2008 was passed to reject the Supreme Court's decisions in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), and Toyota, 534 U.S. 184. Pub L. 110-325 §§ 2(b)(2)-(5). But this Court must apply the version of the ADA's definitions that was in place when Mr. Katz was fired, because the 2008 amendments did not apply retroactively. Becerril v. Pima Cnty. Assessor's Office, 587 F.3d 1162, 1164 (9th Cir. 2009).

8.    In this case, there appears to be no question that
Mr. Katz satisfied the requisite skill, experience, education,
and other job-related requirements of the position or that he was
capable of performing its essential functions, if his visual
disability was properly accommodated. Both Mr. Griffin and
Ms. Mayberry testified that Mr. Katz did good work on various
parts of his cases, was passionate about the technical aspect of
the work, and had valuable knowledge from his extensive practice
in the securities industry. Mr. Katz also passed through the
classroom part of his training with high scores and was clearly
an enthusiastic student during that part of his probationary
year. At trial, he came across as intelligent and knowledgeable
in the fields of mathematics and securities.

        **B.    Reasonable Accommodation**

9.    The term "reasonable accommodation" means
"[m]odifications or adjustments to the work environment . . .
that enable a qualified individual with a disability to perform
the essential functions of [his] position," and "may include but
is not limited to . . . acquisition or modifications of equipment
or devices." 29 C.F.R. § 1630.2(o)(1)-(2).

10.   Once an employer is aware that an employee may be in
need of accommodation, the employer is required to engage in an
interactive process with the employee aimed at determining
appropriate reasonable accommodations. Zivkovic v. S. Cal. Edison
Co., 302 F.3d 1080, 1089 (9th Cir. 2002). The interactive process
requires "(1) direct communication between the employer and the

employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." EEOC v. UPS Supply Chain Solutions, 620 F.3d 1103, 1110 (9th Cir. 2010) (citation omitted). An employer is not obligated to award a disabled employee the precise accommodation he requests: "the employer need only provide some reasonable accommodation." Zivkovic, 302 F.3d at 1088.

11.   Both parties must actively participate in the interactive process. See Humphrey v. Mem. Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001) (reversing grant of summary judgment to employer where employee notified employer that initial accommodation was not working and employer refused to explore alternatives); Allen v. Pac. Bell, 348 F.3d 1113, 1115-16 (9th Cir. 2003) (affirming grant of summary judgment to employer where employee did not submit requested medical information and did not appear for a keyboard test that employer requested to determine appropriate accommodation).

12.   Mr. Katz argues that the IRS's first attempt at accommodation was not reasonable. The Court disagrees. Mr. Katz's reasonable accommodation request did not fully describe the problems that he faced in doing his work. His doctor described his symptoms merely as "headaches." It is difficult to find, as Mr. Katz argues, that the IRS's doctor was "grossly negligent" in her analysis (see Pl.'s Proposed Findings at 2 ¶ 1) when Mr. Katz's doctor so lightly characterized Mr. Katz's problems.

Mr. Katz makes much of the fact that Dr. Cohen never contacted Mr. Katz's own doctor. (Id. at 2 ¶ 1.1.) No doubt that would have been the best practice, but she was not required to do so, particularly where Mr. Katz's doctor had filled out a form that was supposed to detail his problems.

13.   Mr. Katz testified at trial that Dr. Cohen's recommendation to look away from the screen every 15 minutes was the same advice that Mr. Katz's doctors had been giving him for years. He testified at deposition that the advice was effective in preventing spasms, but that the problem was he would get caught up in his work and forget to take a break. (Ex. 122 at 96:12-97:8.) Moreover, Mr. Katz testified at trial that Mr. Griffin's allowing him to work from home made it much easier for him do his work. The Court finds that the accommodation offered to Mr. Katz was made in good faith and was reasonable, given that the intention was for Mr. Katz to be able to use his home monitor.

14.   The next question, then, is whether the IRS knew or should have known that Mr. Katz was not able to use his home monitor. The employer's continuing duty to accommodate its employee's disability is not exhausted by one effort. Humphrey, 239 F.3d at 1138. The employer's duty "continues where the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing." Id. In this case, however, Mr. Katz never asked for a different accommodation, and the IRS was not aware that its initial attempt

37

at accommodation had failed. In <u>Humphrey</u>, the Ninth Circuit found that the plaintiff's repeated absences made it "abundantly clear" to her employer that the accommodation for her disability was not working. <u>Id.</u> at 1138. Here, by contrast, Mr. Katz has not presented sufficient evidence to show that the IRS should have been aware that its accommodation was not working.

15.  Mr. Katz's repeated arguments that Mr. Griffin was not "proactive" enough in solving the problems with his accommodation are unconvincing, since Mr. Katz has not shown that Mr. Griffin was or should have been aware of any problem. The only time that Mr. Katz testified he directly told any supervisor about his equipment problems was the conversation with Mr. Griffin about the IRS's equipment policy. Mr. Griffin, testifying at trial, remembered the conversation but believed that they had discussed the IRS's policy, not Mr. Katz's technical problems connecting his monitor. The Court finds it plausible that this conversation resulted in a miscommunication. Mr. Katz believed he had told Mr. Griffin that his monitor would not connect to the IRS laptop. Mr. Griffin, on the other hand, only understood that an IRS computer technician had told Mr. Katz that it was contrary to IRS policy to connect the monitor. Mr. Griffin told Mr. Katz that he was allowed to connect the monitor and therefore believed that the issue was now resolved.[16] It is undisputed that Mr. Katz

---

[16]  Mr. Griffin and Mr. Katz disputed at trial what exactly IRS policy allowed at the time. That dispute is not relevant here, since Mr. Katz never challenged Mr. Griffin's initial assessment. The Court credits Mr. Griffin's testimony that he

never raised the issue again with Mr. Griffin or anyone else at the IRS.

16.   Mr. Katz argues that Mr. Griffin or Ms. Mayberry ought to have known that the IRS's accommodation wasn't working because Mr. Katz was working long hours and missed his work study deadlines.[17/] Mr. Griffin testified at trial, however, that missed deadlines could be caused by any number of reasons, and that new FP employees frequently had problems with time management. He also testified that both new and experienced FP specialists frequently work long hours. The Court finds Mr. Griffin's testimony credible. There was no reason for Mr. Griffin to infer that Mr. Katz was working long hours and missing deadlines <u>because of his disability</u>, rather than because he was new to the IRS and was having trouble juggling his case load.

17.   Regarding the failure of the reasonable accommodation, Mr. Katz testified in his direct testimony "I sent every possible signal I could <u>without overtly complaining</u>." (Ex. 34 at 2 (emphasis added).) This statement precisely encapsulates the problem with Mr. Katz's claim for failure to accommodate. In his Final Proposed Findings of Fact and Conclusions of Law, Mr. Katz explained that "as a practicing CPA, [he] always tried to hide

---

believed Mr. Katz was allowed to use his monitor with the IRS laptop, particularly given Mr. Griffin's testimony that he himself had been able to connect an IRS computer to his home monitor.

[17/]   Mr. Katz's argument here is somewhat inconsistent with his own testimony that he "sloughed off" the work study deadlines because he felt they were "inane" and "punitive."

his low vision condition and find creative ways to compensate for his poor vision." (Pl. Proposed Findings at 14 ¶ 1.13.) It appears that Mr. Katz continued that pattern of behavior while at the IRS.

18.  Mr. Katz never requested that the IRS reconsider his accommodation request. Moreover, as Mr. Katz continued to receive and respond to failing performance reviews, he never told his supervisors that he was having problems with his monitor. Defense counsel in his closing argument noted five different occasions on which Mr. Katz defended himself against negative reviews but never mentioned his vision problems: (1) the lengthy email exchange with Mr. Griffin regarding his February 21 review (Ex. 125); (2) Mr. Katz's email response to Mr. Livingston's March 13 review (Ex. 108); (3) Mr. Katz's email exchange with Ms. Mayberry regarding the missed work study deadlines (Ex. 128); (4) the April 9 meeting with Ms. Mayberry to discuss her April 5 improvement plan (see Ex. 115); and (5) Mr. Katz's fax to Mr. Griffin regarding the April 5 evaluation (Ex. 30).[18/]

19.  In sum, the evidence presented at trial, taken all together, implies that Mr. Katz did not want to be seen as "overtly complaining" and was reluctant to make evident to the IRS the extent of his visual problems. Unlike the plaintiff in Humphrey, Mr. Katz never asked his employer to revisit his

---

[18/]  On the other hand, Mr. Katz did raise his vision problems in his response to Mr. Griffin's June 8, 2007 final evaluation, but only after he had been told he would be fired. (See Ex. 117 at 4, 6.)

accommodation. Instead, he worked very long hours into the evenings and on weekends. It was not, and could not have been, clear to his supervisors that his vision remained a problem. Mr. Katz's work ethic is admirable, but his reluctance to inform the IRS that its accommodation wasn't working ultimately dooms his claim for failure to accommodate. The IRS cannot be held responsible for failing to accommodate Mr. Katz's disability if Mr. Katz failed to inform the IRS that its first good-faith attempt at accommodation was unsuccessful.

### C. Undue Burden

20. For completeness' sake, the Court notes that there is no dispute that the cost of providing a large monitor for Mr. Katz would not have been an undue burden for the IRS.

## II. Employment Discrimination

21. Mr. Katz's second claim is for non-affirmative action employment discrimination, under 29 U.S.C. § 791(b). The claim has three elements: (1) at the time of the alleged discrimination, plaintiff had a disability within the meaning of the Rehabilitation Act; (2) except for such disability, he was otherwise qualified for the position; and (3) he suffered an adverse employment action "because of" his disability. Walton v. U.S. Marshals Serv., 492 F.3d 998, 1005 (9th Cir. 2007).

22. As noted above, there is no question in this case that Mr. Katz was qualified for his position. The Court will therefore address the other two elements of his claim.

23.   The familiar burden-shifting scheme set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), applies to disability discrimination claims. See Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) (applying McDonnell Douglas burden shifting framework to ADA disability discrimination claim); Kim v. Potter, 474 F. Supp. 2d 1175 (D. Haw. 2007) (applying McDonnell Douglas burden shifting to Rehabilitation Act claim). Under this burden-shifting scheme, Mr. Katz must first set forth a prima facie disability discrimination claim under the Rehabilitation Act. Once Mr. Katz has put forth his prima facie claim, the burden then shifts to the IRS, which must present a legitimate, nondiscriminatory reason for its actions. See Smith v. Barton, 914 F.2d 1330, 1340 (9th Cir. 1990); Lucero v. Hart, 915 F.2d 1367, 1371 (9th Cir. 1990). If the IRS does so, the burden shifts back to Mr. Katz, who must demonstrate that the IRS's proffered reason is pretextual or "encompassed unjustified consideration" of Mr. Katz's disability. Smith, 914 F.2d at 1340.

**A.   Disability**

24.   The IRS contends that Mr. Katz was not disabled after his March 2007 surgeries. (Def. Proposed Findings at 25 ¶ 7.) Mr. Katz contends that he was disabled until June 22, 2007, when he received his final pair of glasses. (Pl. Proposed Findings at 1-2.)

25.   Mr. Katz's own statements are damaging to his argument here. Mr. Katz testified in his deposition as follows:

42

> Q.   . . . Then after March of 2007,
>      after your accommodative spasms
>      stopped, you were able to work off
>      of a computer screen much more
>      easily; right?
>
> A.   I have no problems. . . . But I
>      couldn't really see too well,
>      because . . . it takes time after
>      the surgery for your eyes to
>      stabilize. So . . . in order to
>      work, I had the doctor prescribe
>      glasses for me and then when the
>      glasses stopped working, I would go
>      back and get another prescription.
>      . . . I'd have to go back to the
>      doctor, get a new prescription,
>      until my eyes finally
>      stabilized . . . .

(Ex. 122 at 175:19-176:14.) Describing his frequently changing prescription in an e-mail to Mr. DeLuca in late March 2007, Mr. Katz said, "[e]very time it gets bad enough, I have to get the prescription changed. It's not as bad as it sounds. But, it is a nuisance." (Ex. 127.)

26.   The Court credits Mr. Katz's argument that, as a person who has always had poor vision, his statements that his vision was fine or without problems after his cataract surgeries were not meant to indicate that he had perfect vision. (Pl. Proposed Findings at 4 ¶ 1.5.) But poor vision, correctable by glasses, does not rise to the level of a disability under the ADA. The term "substantially limits" "clearly precludes impairments that interfere in only a minor way . . . from qualifying as disabilities." Toyota Motor Mfg., 534 U.S. at 197. After March 8, 2007, Mr. Katz no longer suffered from accommodative spasms or episodes of temporary blindness. He had poor but correctable

43

vision. He testified that he was able to sharply reduce the number of hours he worked per day. That he was forced to change his glasses lenses frequently because his eyes were still adjusting is unfortunate and was undoubtedly expensive,[19] but does not rise to the level of a disability.

27.   Mr. Katz also contends that even if he was not disabled under the meaning of the Rehabilitation Act after March 8, 2007, the seeds for his dismissal were sown while he was disabled, by the IRS's failure to accommodate his disability. The Court agrees that the IRS's argument that Mr. Katz "was not disabled at the time of his termination" (Def. Proposed Findings at 22) is too narrow a framing of the issue. The Court will address this argument regarding causation below.

###  B.   Causation

28.   "Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of his disability." Humphrey, 239 F.3d at 1139. The employee bears the burden of proof on this element. See Costa v. Desert Palace, Inc., 299 F.3d 838, 857 (9th Cir. 2002). There is no dispute that Mr. Katz was fired; the question is whether he was fired "because of" his disability. This raises the question of how to define "because of."

---

[19]   The Court notes and credits Mr. Katz's statement that he "made every effort during the course of his employment to . . . improve his vision on his own and at his own expense." (Pl. Proposed Findings at 8 ¶ 1.9.)

## 1.  **Legal Standard**

29.  Formerly, courts in this circuit had applied to disability discrimination claims the "motivating factor" standard which was added to Title VII by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m) (which itself adopted and partially abrogated the Supreme Court's decision in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)). E.g., Head v. Glacier Nw., Inc., 413 F.3d 1053 (9th Cir. 2005).[20] In 2009, however, the Supreme Court held that Title VII's "motivating factor" standard could not be applied to age discrimination claims under the Age Discrimination in Employment Act of 1967 ("ADEA"). Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). The Supreme Court's rejection of the "motivating factor" standard was based on the differences between Title VII and the ADEA; Congress had added the "motivating factor" standard to Title VII only, even though it amended the ADEA at the same time. Id. at 174. The Gross decision prompted a "burgeoning circuit split" as the circuit courts attempted to

---

[20]  It is important to note that although claims brought under section 504 of the Rehabilitation Act require the plaintiff to prove that action was taken against him "solely by reason of" his disability, claims, like Mr. Katz's, brought under section 501 are subject to the ADA's causation standards, and thus merely require that the action be taken "because of" the plaintiff's disability. See Head, 413 F.3d 1053. It is quite clear that the ADA standards incorporated into the Rehabilitation Act under section 501(g) "do not require the adverse employment action to have been 'solely by reason of' disability, in contrast to the explicit terms of § 504." Ward v. Vilsak, No. 2:10-CV-00376, 2011 WL 6026124, at *12 (E.D. Cal. Dec. 2, 2011) (citations omitted); see 42 U.S.C. § 12112(a). The legislative history of the Act shows that the omission of this language was not accidental. See McNely v. Ocala, 99 F.3d 1068, 1075 (11th Cir. 1996) (quoting H.R. Rep. No. 485(II), 2nd Sess., at 85 (1990)).

parse whether Gross's reasoning should apply to claims under other non-Title VII statutes. See generally Deborah A. Widiss, Undermining Congressional Overrides: The Hydra Problem in Statutory Interpretation, 90 Tex. L. Rev. 859 (2012) (providing national overview of Gross's progeny). The issue is particularly thorny when contemplating Rehabilitation Act claims: on the one hand, the ADA's causation language, which is incorporated by section 501 of the Rehabilitation Act, is very similar to the ADEA's, compare 42 U.S.C. §§ 12203 (ADA) to 29 U.S.C. §§ 623(a)(1) (ADEA); on the other hand, the Rehabilitation Act explicitly incorporates Title VII's standards and remedies, see 29 U.S.C. § 794a(a)(1).

30.   The Ninth Circuit has not ruled on whether Gross applies to disability discrimination claims.[21] But every circuit court of appeals to examine the application of Gross to ADA claims has required ADA plaintiffs to prove "but-for" causation. The Sixth and Seventh Circuits squarely held that Gross requires "but-for" causation in ADA cases. Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 961-62 (7th Cir. 2010); Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 318-19 (6th Cir. 2012). The Third Circuit had already required "but-for" causation before Gross was decided. New Directions Treatment Servs. v. City

---

[21]   The only district court in this circuit to address the issue held that Gross does apply to such claims, and therefore that an ADA plaintiff must prove "but-for" causation. Ross v. Independent Living Resource, No. C08-00854, 2010 WL 2898773, at *6 (N.D. Cal. July 21, 2010).

of Reading, 490 F.3d 293, 301 n.4 (3d Cir. 2007). The Eighth
Circuit noted without deciding the issue that "[w]e have our
doubts" about applying the "motivating factor" standard to ADA
claims after Gross. Pulczinski v. Trinity Structural Towers,
Inc., 691 F.3d 996, 1002 (8th Cir. 2012).

     31.   The only circuit court of appeals to address whether
Gross's reasoning applies specifically to Rehabilitation Act
claims is the First Circuit, which held that a plaintiff under
the Rehabilitation Act had to prove "but-for" causation.
Palmquist v. Shinseki, 689 F.3d 66, 73-74 (1st Cir. 2012).
Shinseki discusses the interpretation of this complex statutory
scheme thoroughly and clearly. This Court finds the First
Circuit's reasoning convincing.

     32.   In sum, Mr. Katz need not prove that his disability was
the only reason he was fired, but he must prove that but for his
disability, he would not have been fired.

## 2.   Application to Facts of this Case

     33.   In this case, Mr. Katz does not argue that his
supervisors were directly prejudiced against disabled people.
(See, e.g., Ex. 122 at 91:12-21.) Rather, he argues that the IRS
failed to reasonably accommodate his disability, that the
accommodation failure resulted in his job performance being
inadequate, and that he was fired because of those inadequacies.
(See Ex. 34 at 2.) As the Ninth Circuit noted in Humphrey, "[t]he
link between the disability and termination is particularly
strong where it is the employer's failure to reasonably

47

accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." 239 F.3d at 1140.

34.  As a preliminary matter, up until trial, Mr. Katz had consistently argued that his performance was "exemplary" and that he had been fired because he is Jewish and a Republican. (Ex. 122 at 82:16-25; see id. at 91:12-92:4; 94:15-95:4.) In his July 2007 Hatch Act complaint he stated that "[t]he argument that I was fired because of poor performance is completely fabricated out of thin air." (Ex. 120 at ¶ 15.) At his deposition, he testified, "I was fired because of my political beliefs, period" and claimed that Mr. Griffin "wanted to get rid of me ever since Jerry DeLuca interviewed me to find out that I was really not a Democrat." (Ex. 122 at 95:1-2; 103:24-104:1.) In his deposition, the following exchange occurred:

> Q.  You are aware that the IRS contends that they fired you for performance issues, right?
>
> A.  That's what they contend.
>
> Q.  Okay. Is it your contention, as you sit here today, that, in fact, your performance was at least adequate?
>
> A.  It was exemplary.

(Id. at 82:16-25.) And later:

> Q.  But it's your contention, as I understand it, that as a result of working long hours you were able to do, as you call it, an exemplary job for the IRS, right?
>
> A.  I did.

48

(<u>Id.</u> at 102:16-19.)

35.   It is difficult to reconcile those representations with Mr. Katz's current argument that his performance was poor in places because of his visual problems, and that he was fired because of those parts of his performance. Nonetheless, the Court will now address Mr. Katz's current theory of the case.

### a.   Prima Facie Case

36.   It is undisputed that Mr. Katz had an excellent work record for his first five months on the job, and only began to receive negative reviews after his classroom training period ended. Mr. Katz argued at trial that this timing is circumstantial evidence that his poor work reviews stemmed from his vision problems, since after his classroom training ended he had to do more close work. The timing is also consistent, however, with Mr. Griffin's trial testimony that Mr. Katz's performance was good while he was mostly in class and had few cases. Mr. Griffin testified that once Mr. Katz was out of the classroom, it became apparent that he was not good at juggling multiple cases and was resistant to the administrative work that the full-time specialist position requires, refusing to follow instructions and rejecting criticism of his case work.

37.   Mr. Katz has not presented evidence sufficient to show that he missed the work study deadlines assigned to him by Ms. Mayberry because of his vision problems. Indeed, the evidence shows that Mr. Katz ignored these deadlines because he believed they were inane and punitive and did not consider them to be

49

"real" deadlines. Mr. Katz and Ms. Mayberry communicated repeatedly about the work study deadlines. Ms. Mayberry testified at trial – and Mr. Katz has admitted – that he never explained that he had been unable to meet the deadlines because his vision problems were interfering with his work. Even if he did miss these deadlines because of his vision problems, however, the bulk of his performance issues were related not to deadlines but to attitude and interpersonal difficulties.

38.  Mr. Katz argued in his deposition that his vision problems caused his irritable behavior towards Ms. Mayberry. (Ex. 122 at 104:16-22.) That contention is not plausible. Mr. Katz himself presented substantial evidence that he was not hostile or contentious when working on other cases or with other people; and Ms. Mayberry repeatedly testified that Mr. Katz was very pleasant to her as long as they were not discussing the Bridge Case. The evidence presented at trial showed that Mr. Katz was assigned several other complex, stressful cases during this period, notably the SILOs case, but that Mr. Katz had interpersonal difficulties only with Ms. Mayberry. The evidence suggests, therefore, not that Mr. Katz was generally irritable during this period, but that he was unable to respond appropriately to having a substantive disagreement with a supervisor.

39.  Finally, Mr. Katz has produced no evidence that the problems with his workpapers that Mr. Griffin identified in June 2007 were caused by his vision problems. Mr. Katz argues that he

50

did not receive the correct training on these workpapers, but has produced no evidence that the alleged inadequacies in his training were in any way related to his vision problems.

40.   The Court concludes that Mr. Katz has not presented evidence of a prima facie case of disability discrimination. Even if he had presented a prima facie case, however, the IRS has presented extensive evidence of its legitimate, nondiscriminatory reasons for firing Mr. Katz, as discussed below.

### b.   IRS's Stated Reasons for Termination

41.   Ms. Wong's termination letter, and her trial testimony, listed four 2007 performance reviews as reasons for firing Mr. Katz: (1) Mr. Griffin's February 21 review; (2) Mr. Livingston's March 5 review; (3) Ms. Mayberry's April 5 review and improvement plan; and (4) Mr. Griffin's June 8 workload review. In her letter, she noted that at each of these reviews Mr. Katz failed at least three "Critical Elements" of his work, and that at the April 5 review he failed all of them.

42.   As a preliminary matter, on the IRS's witness' own testimony, Mr. Livingston's negative review of Mr. Katz's work on the SILOs case should not have been included in Ms. Wong's final review. Mr. Griffin testified that at some point after Mr. Livingston's review, it was determined that Mr. Katz's assignment on the SILOs case was impossible to complete in the time originally given to him. Mr. Griffin also testified that the March 5 review was not included in Mr. Katz's later performance evaluations. That testimony does not appear to be accurate,

51

although it was not given in bad faith - Mr. Griffin deliberately excluded the SILOs case from his June review. Nonetheless, Ms. Wong apparently still considered it.

43.   Even disregarding Mr. Livingston's March 5 review, however, the IRS has presented substantial evidence of its legitimate, nondiscriminatory reasons for firing Mr. Katz.

44.   Most importantly, there is extensive evidence in the record regarding Mr. Katz's dispute with Ms. Mayberry and Mr. Moren over the correct characterization of the Bridge Case and the use of gambling terminology, and with Ms. Mayberry alone over his use of Mr. Anderson's draft report. It is clear that Mr. Katz did not meet the objectives of his April 5 improvement plan. Despite multiple warnings - and despite Mr. Katz's testimony that he understood on April 5 that if he did not conform to the improvement plan he could be fired - his final draft report for the Bridge Case contained nearly all of the problems identified by Ms. Mayberry in the April 5 document.

45.   Mr. Katz's interpersonal difficulties with his OJI were also extreme. Mr. Katz presented past testimony from other IRS employees that Mr. Katz was enthusiastic, helpful, and not hostile. The Court does not doubt the accuracy of these characterizations. They are, however, consistent with Ms. Mayberry's repeated testimony that Mr. Katz was very nice to her as long as they were not discussing the Bridge Case. Ms. Mayberry's testimony about Mr. Katz's hostility toward her when discussing the Bridge Case is corroborated by Mr. Katz's

extremely negative statements about Ms. Mayberry during his deposition. Apart from accusations of anti-Semitism, he also described her as stupid, obstinate, rigid, crazy, and somewhat senile.[22/] It was clear during Mr. Katz's trial testimony that the he now regrets some of the words he used in his deposition and that some of them no longer accurately reflect how he feels about Ms. Mayberry. Nonetheless, his deposition testimony is consistent with Ms. Mayberry's descriptions of his inappropriate anger regarding the Bridge Case.

46.  Mr. Katz clearly believed - and still believes - that he understood the Bridge Case better than Mr. Griffin and Ms. Mayberry. The Court need not decide the merits of this dispute: "courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002). The relevant point is that, while still in his first year at the IRS, and still on probation, Mr. Katz stubbornly refused to defer to the judgment of three senior specialists with, between them, several decades of experience in the field. Mr. Katz first presented his theory of the case in, at the latest, November 2006, and stubbornly stuck

---

[22/]  The Court notes that during Ms. Mayberry's lengthy trial testimony, she came across as thoughtful, intelligent, and competent. The Court found no corroboration for Mr. Katz's descriptions of her. The Court also found that both Ms. Mayberry and Mr. Griffin were generally credible witnesses. The Court finds that they supervised Mr. Katz in good faith and in a professional manner.

to it for seven months. Mr. Eldred, Mr. Griffin, and Ms. Mayberry all disagreed with Mr. Katz's assessment. The team manager, Mr. Moren, was unhappy with Mr. Katz's approach. Even if Mr. Katz were right about the Bridge Case after all, the IRS was justified in finding his attitude unworkable. Most jobs require an employee to adjust to the culture and expectations of his employer. Mr. Katz was apparently unable to adjust to the IRS's culture and expectations.

47. Mr. Katz's arguments that Ms. Mayberry and Mr. Griffin were in effect asking him to lie in his report are unavailing. It was quite clear from their testimony that Ms. Mayberry and Mr. Griffin believed their interpretation of the Bridge Case to be accurate; the dispute was over how to interpret the facts and law, and the appropriate language in which to present the arguments. Mr. Katz was simply unable - and is still unable – to accept that Ms. Mayberry or Mr. Griffin's interpretation might be more accurate than his own, or their approach better suited to the purposes of an FP report.

48. Finally, Mr. Griffin's June 2007 audit of Mr. Katz's workpapers was another factor in his termination. Mr. Katz repeatedly suggested at trial that he had not received proper training on workpapers and that Mr. Griffin had failed to check on the training he was receiving. Neither party produced evidence as to what training, exactly, Mr. Katz received. Regardless, Mr. Griffin testified that based both on the papers and on conversations he had with Mr. Katz, he felt Mr. Katz did not take

seriously the administrative parts of his job. He testified that Mr. Katz told him that he did not like the bureaucracy of working for the government.

49.   Mr. Griffin's decision not to include the Bridge Case in his final audit is perplexing, since by all accounts that case comprised the majority of Mr. Katz's work. The Court cannot infer any improper motive or unfair outcome from the decision, however, for two reasons. First, Mr. Griffin was well aware that Mr. Katz's work on the Bridge Case had not been acceptable; presumably if he were aiming to find fault with Mr. Katz, he would have included the Bridge Case in his review. Second, Mr. Griffin testified, and the Court believes, that including the Bridge Case in his review would not have benefitted Mr. Katz, but rather would only have made the review more negative.

### D.   Conclusion as to Employment Discrimination Claim

50.   In sum, the Court does not find that Mr. Katz ever acted in bad faith; indeed, it is quite clear that Mr. Katz cared passionately about his job and was trying to do it well. Unfortunately, the choices that he made while working make it entirely understandable that the IRS no longer wished to employ him. Mr. Katz was fired for a host of problems, but primarily because he was unprofessional and disrespectful to his supervisors when discussing his work on the Bridge Case, refused to defer to their judgment, and failed to keep up his workpapers properly on other cases. The IRS has provided sufficient evidence to show that if Mr. Katz had suffered no visual problems at all,

55

he still would have been fired. Indeed, even if the Court were to apply the pre-<u>Gross</u> "motivating factor" test, Mr. Katz has not shown that his disability was a motivating factor in the IRS's decision to fire him.[23/]

<u>**DECISION**</u>

It is clear both from the documentary evidence and from the witnesses' testimony that Mr. Katz was good at and well suited to some parts of his job. Ms. Mayberry testified that the facts section of the Bridge Case report was very good and that Mr. Katz asked intelligent and helpful questions of the taxpayer's executive officer. Mr. Griffin repeatedly testified that Mr. Katz cared about the technical part of FP work and that his experience in the securities broker-dealer industry was an asset. Mr. Griffin also agreed that Mr. Katz was very conscientious and tried hard to follow rules. Mr. Katz himself gave heartfelt testimony about his passion for tax law. There is no question that Mr. Katz cared deeply about his job and about the IRS's mission. The Court was impressed that Mr. Katz is a very

---

[23/] As noted above, Mr. Katz has not shown that his visual disability caused any of the problems for which the IRS fired him. First, he argued that his visual problems caused him to miss Ms. Mayberry's work study deadlines; but he testified in deposition that he "sloughed off" those deadlines because he felt they were "inane" and "punitive" and were not "real" deadlines. Second, he also argued that the long hours he was working caused him to be irritable with Ms. Mayberry over the Bridge Case; but that contention is not plausible because he presented extensive evidence that he did not become irritable when dealing with any other IRS employees on any of his other cases.

principled man. The Court commends his patriotism and his dedication to his Jewish faith.

Mr. Katz's conduct on the job was, however, consistently self-destructive. He did not tell anyone at the IRS that the accommodation for his visual disability wasn't working; he just worked more hours. He did not raise with Ms. Mayberry or Mr. Griffin, or anyone else at the IRS, his feelings that he was being victimized because of his religion or his political beliefs; he just bottled them up, and perhaps allowed them to influence his behavior with Ms. Mayberry. He did not push for extra training on the administrative parts of the job that he apparently was not comfortable with. He argued with his supervisor and his instructor, refused to take instruction from them, and responded angrily and obstinately to criticism.

In sum, the Court must find in favor of the IRS. As to Mr. Katz's claim for failure to accommodate, the IRS offered, in good faith, an initial reasonable accommodation of Mr. Katz's disability. Mr. Katz failed to notify the IRS that the accommodation was not working. As to Mr. Katz's claim for wrongful termination, Mr. Katz has failed to show that his disability was either the "but for" cause or a motivating factor in his termination.

In light of the foregoing findings of fact and conclusions of law, the Court finds that:

> (1) Mr. Katz has failed to prove his claims by a
> preponderance of the evidence, and

(2) the IRS is entitled to judgment on all counts.

Having made those findings, the Court concludes that the IRS's motion for judgment on partial findings is moot.


IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, March 4, 2013



_____
Alan C. Kay
Sr. United States District Judge


Katz v. Geithner, Civ. No. 09-00599 ACK-RLP, Findings of Fact, Conclusions of Law, and Decision